ROETENBERGER, Admr., Appellant,

v.

CHRIST HOSPITAL et al.; Greater Cincinnati Gastroenterology
Associates, Inc., et al., Appellees.

[Cite as *Roetenberger v. Christ Hosp.*, 163 Ohio App.3d 555, 2005-Ohio-5205.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–040009.

Decided Sept. 30, 2005.

556

Waite, Schneider, Bayless & Chesley Co., L.P.A., Stanley M. Chesley, Jane H. Walker, Louise M. Roselle, and Paul DeMarco, for appellant.

Lindhorst & Dreidame, Michael F. Lyon, and Bradley D. McPeek, for appellees.

DOAN, Presiding Judge.

{¶ 1} On July 2, 2001, 42-year-old Karen Roetenberger went to The Christ Hospital for endoscopic retrograde cholangio-pancreatography ("ERCP"), an outpatient procedure to remove bile duct stones. Defendant-appellee Dr. Zahid Saeed, a gastroenterologist, performed the procedure. During the ERCP procedure, the surgeon guides a small tube down the patient's esophagus and into the intestines. ERCP is performed while the patient is medicated to a state of conscious sedation. Conscious sedation is achieved through the use of drugs that render the patient calm but responsive.

{¶ 2} Approximately 50 minutes into the procedure, Karen Roetenberger's blood-oxygen saturation level plummeted. She became hypoxic, a condition characterized by too little oxygen in the blood. The ERCP was aborted and a code was called. Karen Roetenberger's oxygen level was restored, but she suffered cardiac arrest. Although The Christ Hospital code team was able to resuscitate Karen Roetenberger, she never regained consciousness, and she died nine days later.

{¶ 3} Karen Roetenberger's husband, plaintiff-appellant, John Roetenberger ("Roetenberger"), filed a complaint for wrongful death and medical malpractice. Prior to trial, defendants The Christ Hospital and Anesthesia Associates of Cincinnati, Inc., were dismissed. The claims against Saeed and his practice group, defendant-appellee Greater Cincinnati Gastroenterology Associates, Inc. ("GCGA"), were tried to a jury. Following an 11–day trial, the jury rendered a verdict in favor of Saeed and GCGA. Roetenberger has appealed.

{¶ 4} The first assignment of error alleges that the trial court erred in permitting defense counsel to make improper and inflammatory statements to the jury during his closing argument.

{¶ 5} During his closing argument, defense counsel stated to the jury, "The plaintiff thinks it's just about money. They think they can just throw it up on the wall and give you some testimony and you will walk back into this courtroom and make them rich people. * * * They don't want a reasoned debate. They have not wanted that from opening statement and they don't want it now. They want money. * * * You have to find that if you are giving all this money. * * * But I suggest to you that that's the type of manipulations going on here for money. * * * That's the medical truth. Not their money truth. * * * What on earth is going on in this case? I'll tell you what's going on. Money. Nine million dollars. Let's get rich on this case at [Dr. Saeed's] expense. * * * It has nothing to do with medicine. It has to do with money. That's all it has to do with. * * * Because [the plaintiff's case is] calculated to try to get you to go back in the jury room and feel terribly sympathetic for this family, this nice guy and his two nice children, and give them nine million dollars, and that's wrong. That would be in my view an absolute wrong thing to do. But they don't care. They just want the money. They come in here and talk about the constitution. You speak for this country. I do not. When you walk back into this courtroom with your verdict it will say a lot of things, a lot of things about this kind of conduct in American courts. And if you want to verify it, if you want to be part of it, that will be your choice. * * * There hasn't been one recognition in this courtroom that [Dr. Saeed is] a human being over there. That's not an ATM machine. * * * Well, you carry back in this courtroom—whether you agree with that kind of conduct you will carry a verdict back which says yes to that kind of conduct, to that kind

of greed, and you'll affirm that behavior. And if you do, that's your prerogative. I don't think you will because you know the answer."

{¶ 6} Regarding Roetenberger's counsel, defense counsel stated to the jury, "[Roetenberger's counsel] don't want a reasoned debate. They have not wanted that from opening statement and they don't want it now. They want money. If they wanted a reasoned debate about the medical components of a medical case they would know how to ask medical questions. * * * That's an absolute and utter misrepresentation and manipulation of the burden of proof. * * * Manipulation, manipulation, manipulation. Don't let them do it. It's wrong. * * * That's the only thing they can do in front of you because they don't know how to ask the people questions. That's what's going on here. They stand up here and malign my three experts. They had a chance to cross-examine these people and ask them intelligent questions and pronounce the drugs appropriately and ask them questions about medicine and they didn't do it. Why? Because they didn't know how. They didn't have a clue. I'm going to talk to you for a minute how they still after two and a half years don't understand the case. * * * Is this the way people are going to be treated in an American courtroom? Is this the way with this kind of deplorable evidence, where they don't know the medicine and if they can't cross-examine experts they have to try to insult them as they've insulted Dr. Saeed in this courtroom? And they want nine million dollars for that? * * * Their hearts are empty. Their souls are empty for what they've done in this courtroom to this doctor. * * * They've tried every trick in the book. And let me show you the trick because you know I'm right. The game they played in this courtroom is deplorable." Defense counsel also warned the jurors that returning a verdict in Roetenberger's favor would "affirm" the behavior of plaintiff's counsel.

{¶ 7} Defense counsel maligned Roetenberger's experts, accusing them of "manipulating" the case and "participating in this creation of this lawsuit against this good doctor to make all kinds of money." Defense counsel called one of Roetenberger's medical experts an idiot, arguing that the expert was not credible because he wore "gym shoes and baggy pants." Defense counsel also argued to the jury that returning a verdict in Roetenberger's favor would brand Saeed "with malpractice for the rest of his life" and reward Roetenberger's greed.

{¶ 8} Defense counsel injected his personal views on the evidence into the trial, stating, "I think that [a nurse who testified] was a spectacular witness. * * * I don't think money should be awarded. Not a penny. * * * They have treated [Dr. Saeed] in a deplorable fashion in my view, deplorable. * * * [Compensating Roetenberger] would be in my view an absolute wrong thing to do."

{¶ 9} Closing argument presents counsel with the opportunity to comment on the evidence and the reasonable inferences to be drawn from the

evidence. See *Wilson v. Ahn,* 1st Dist. No. C–020615, 2003-Ohio-4305, 2003 WL 21946756. Remarks or arguments that are not supported by the evidence and are designed to arouse passion or prejudice to the extent that there is a substantial likelihood that the jury may be misled are improper. See *Brokamp v. Mercy Hosp. Anderson* (1999), 132 Ohio App.3d 850, 726 N.E.2d 594; *Jones v. Olcese* (1991), 75 Ohio App.3d 34, 598 N.E.2d 853. "When argument spills into disparagement not based on any evidence, it is improper." *Clark v. Doe* (1997), 119 Ohio App.3d 296, 307, 695 N.E.2d 276, citing *Cusumano v. Pepsi–Cola Bottling Co.* (1967), 9 Ohio App.2d 105, 38 O.O.2d 132, 223 N.E.2d 477. Counsel is obligated to refrain from unwarranted attacks on opposing counsel, the opposing party, and the witnesses. See *Jones v. Macedonia–Northfield Banking Co.* (1937), 132 Ohio St. 341, 8 O.O. 108, 7 N.E.2d 544; *Dillon v. Bundy* (1991), 72 Ohio App.3d 767, 596 N.E.2d 500. It is the trial court's duty to see that counsel's statements are confined to proper limits and to prohibit counsel from creating an atmosphere of passion and prejudice or misleading the jury. See *Clark v. Doe,* supra, citing *Jones v. Macedonia–Northfield Banking Co.,* supra. Abusive comments directed at opposing counsel, the opposing party, and the opposing party's witnesses should not be permitted. See *Pesek v. Univ. Neurologists Assn., Inc.* (2000), 87 Ohio St.3d 495, 721 N.E.2d 1011. If there is room for doubt about whether counsel's improper remarks may have influenced the outcome of the case, that doubt should be resolved in favor of the losing party. See id.

{¶ 10} Defense counsel's remarks in the instant case were clearly designed to arouse the jury's passion and prejudice. Defense counsel made various assertions and drew inferences that were not supported by any evidence. Defense counsel painted Roetenberger, his counsel, and his witnesses as greedy, empty-hearted people without souls who were manipulating the lawsuit and "branding" a good doctor all for the sake of money. Defense counsel went so far as to warn the jury that a verdict in favor of Roetenberger would "affirm" that type of "behavior in an American court."

{¶ 11} The attacks on Roetenberger, his counsel, and his witnesses were "inexcusable, unprincipled, and clearly outside the scope of final argument." *Pesek v. Univer. Neurologists Assn., Inc.,* 87 Ohio St.3d at 501, 721 N.E.2d 1011. The trial court erred in permitting defense counsel to direct such abusive remarks at Roetenberger, his counsel, and his witnesses. See id. The remarks were improper and beyond the bounds of permissible argument. See id.; *Furnier v. Drury,* 163 Ohio App.3d 793, 2004-Ohio-7362, 840 N.E.2d 1082; *Clark v. Doe,* supra. We recognize that Roetenberger's counsel did not object to all of defense counsel's remarks, but after reviewing defense counsel's closing statement as a whole, we hold that there was a substantial likelihood that the jury was misled and that the verdict was influenced by defense counsel's improper

remarks. See *Pesek v. Univ. Neurologists Assn., Inc.,* supra; *Furnier v. Drury,* supra.

{¶ 12} Saeed argues that Roetenberger's counsel also engaged in improper argument. If Roetenberger's counsel did argue improperly, doubts about whether counsel's improper remarks misled the jury and influenced the outcome of the case must be resolved in favor of the losing party. See id. The first assignment of error is sustained.

{¶ 13} The second assignment of error alleges that the trial court erred in instructing the jury on "different methods of treatment." The different-methods instruction is given in appropriate cases to inform the jury that when alternative methods of treatment can be used, "the selection of one method over the other is not in and of itself negligence." *Pesek v. Univ. Neurologists Assn., Inc.,* 87 Ohio St.3d at 498, 721 N.E.2d 1011.

{¶ 14} A jury instruction is proper if it correctly states the law and if it applies in light of the evidence adduced in the case. See *Murphy v. Carrollton Mfg. Co.* (1991), 61 Ohio St.3d 585, 591, 575 N.E.2d 828; *Pallini v. Dankowski* (1969), 17 Ohio St.2d 51, 53, 46 O.O.2d 267, 245 N.E.2d 353. In reviewing whether the evidence supports a particular jury instruction, an appellate court must " 'determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction.' " *Murphy v. Carrollton Mfg. Co.,* 61 Ohio St.3d at 591, 575 N.E.2d 828, quoting *Feterle v. Huettner* (1971), 28 Ohio St.2d 54, 57, 57 O.O.2d 213, 275 N.E.2d 340, syllabus. "By its very terms, in medical malpractice cases, the 'different methods' charge to the jury is appropriate only if there is evidence that more than one method of diagnosis or treatment is acceptable for a particular medical condition." *Pesek v. Univ. Neurologists Assn., Inc.,* 87 Ohio St.3d at 498, 721 N.E.2d 1011.

{¶ 15} The trial court in the case sub judice instructed the jury that "[a]lthough some other gastroenterologists might have used a method different from that used by Dr. Saeed, this in itself does not prove negligence."

{¶ 16} The record contains no evidence that any method of treating Karen Roetenberger's bile duct stones different from an ERCP with conscious sedation was within the standard of care. The question was whether Saeed was negligent in performing the procedure, administering the reversal drugs, or caring for Karen Roetenberger when she coded.

{¶ 17} We hold that the trial court erred in giving the different-methods instruction. The second assignment of error is sustained.

{¶ 18} Roetenberger's third assignment of error, which alleges that the trial court erred in permitting Dr. Jeffrey Gross to testify for Saeed because

Gross had been designated as an expert for another defendant but not for Saeed, and because Gross offered new opinions not contained in his previous deposition testimony, is overruled. Roetenberger knew Gross's identity, the subject of his expertise, and the general nature of his testimony. See *Cherovsky v. St. Luke's Hosp. of Cleveland* (Dec. 14, 1995), 8th Dist. No. 68326, 1995 WL 739608. In addition, the trial court stopped the trial and allowed Roetenberger to again depose Gross regarding his opinions. We hold that the trial court did not abuse its discretion in allowing Gross to testify. See *Brokamp v. Mercy Hosp. Anderson,* supra, 132 Ohio App.3d 850, 726 N.E.2d 594.

{¶ 19} Roetenberger also argues under this assignment of error that the trial court erred in permitting Gross to give opinions outside his expertise. The competency of an expert is left to the sound discretion of the trial court. See *Scott v. Yates* (1994), 71 Ohio St.3d 219, 221, 643 N.E.2d 105. We agree with the trial court that the fact that Gross was an anesthesiologist went to the weight to be given his opinions and not to their admissibility. See *Youssef v. Parr, Inc.* (1990), 69 Ohio App.3d 679, 695, 591 N.E.2d 762; *Rouse v. Riverside Methodist Hosp.* (1983), 9 Ohio App.3d 206, 9 OBR 355, 459 N.E.2d 593.

{¶ 20} The fourth assignment of error alleges that the trial court erred in denying Roetenberger's request for an "adverse inference" instruction.

{¶ 21} In *Brokamp v. Mercy Hosp. Anderson,* supra, 132 Ohio App.3d at 870, 726 N.E.2d 594, we stated, "The concept of negative, or adverse, inference arises where a party who has control of the evidence in question fails, without satisfactory explanation, to provide the evidence. In that situation, the jury may draw an inference that would be unfavorable to that party. For example, this concept applies where the party willfully suppresses evidence that, if produced, would explain that party's conduct. ' "Ohio courts normally would require a strong showing of malfeasance—or at least gross neglect—before approving such a charge." ' " (Footnotes omitted.) Quoting *Sullivan v. Gen. Motors Corp.* (N.D.Ohio 1991), 772 F.Supp. 358, 364.

{¶ 22} Roetenberger argues that his malpractice claim was based in part on the improper monitoring of his wife during the ERCP procedure. Roetenberger further argues that hospital procedure required the monitoring and recording of a patient's vital signs before and during the procedure. Some vital signs such as blood pressure, oxygen saturation, and pulse rate could be monitored by a protocol machine. Other vital signs were required to be noted and handwritten on the patient's chart. There were no records of Karen Roetenberger's vital signs during the ERCP procedure. Roetenberger argues that the absence of any record of Karen Roetenberger's vital signs required the giving of the adverse-inference instruction.

{¶ 23} The nurse who was monitoring Karen Roetenberger during the ERCP procedure testified that she continuously observed the patient. The nurse testified that typically the protocol machine recorded a patient's vital signs. At the end of the surgical procedure, it was the nurse's job to print the record from the protocol machine and to staple it to the nurse's notes. According to the nurse, Karen Roetenberger's protocol-machine record was not printed, because at the end of the procedure all attention was focused on resuscitating her. By the time the nurse returned to the protocol machine to print out the vital signs, another nurse had turned off the machine, rendering Karen Roetenberger's vital signs irretrievable.

{¶ 24} In *Brokamp v. Mercy Hosp. Anderson*, supra, 132 Ohio App.3d 850, 726 N.E.2d 594, we held that the fact that a nurse did not chart an injection site did not warrant a conclusion of gross neglect or require an adverse-inference instruction. No adverse-inference instruction was warranted because a plausible explanation was given for the loss or misplacement of several biopsy slides. See *Cherovsky v. St. Luke's Hosp. of Cleveland*, supra, 8th Dist. No. 68326, 1995 WL 739608. When there was nothing to show that the destruction of evidence was willfully designed to disrupt the plaintiff's case, an adverse-inference instruction was inappropriate. See *Vernardakis v. Thriftway, Inc.* (May 7, 1997), 1st Dist. No. C–960713. Without evidence that the doctor or the hospital staff intentionally disposed of the doctor's dictation, an adverse-inference instruction was not appropriate. See *Keen v. Hardin Memorial Hosp.*, 3rd Dist. No. 6–03–08, 2003-Ohio-6707, 2003 WL 22939453.

{¶ 25} We hold that the evidence did not support an adverse-inference instruction in this case. There was no strong showing of malfeasance. The nurse provided a plausible explanation for the absence of a record of Karen Roetenberger's vital signs. The trial court did not err in refusing to give the instruction. The fourth assignment of error is overruled.

{¶ 26} The fifth assignment of error, which alleges that the verdict was against the manifest weight of the evidence, is made moot by our disposition of the first and second assignments of error, and we decline to review it.

{¶ 27} The judgment of the trial court is reversed, and this cause is remanded for a new trial and for further proceedings consistent with law and this decision.

Judgment reversed
and cause remanded.

SUNDERMANN, J., concurs.

GORMAN, J., dissents.

GORMAN, J., dissenting.

{¶ 28} The majority's opinion joins a recent trend in this appellate district of reversing jury verdicts in medical-malpractice cases supposedly because comments by counsel for the physician or hospital went beyond the bounds of closing argument. I disagree with the majority's conclusion in this appeal and find no support for the argument that Dr. Saeed's counsel "grossly and persistently abuse[d] his privilege" in closing argument. See *Snyder v. Stanford* (1968), 15 Ohio St.2d 31, 44 O.O.2d 18, 238 N.E.2d 563, paragraph one of the syllabus.

{¶ 29} In the 62 pages of transcript that comprise the closing argument of Dr. Saeed's counsel, Roetenberger objected only four times. Three objections targeted counsel's use of the words "rich people," "brand with malpractice," and "during." The fourth objection related to an argument by Roetenberger's counsel comparing the preponderance-of-evidence standard to half a glass of water. Dr. Saeed's counsel said, "Now let me take their glass of water here that they put and they say just trickle a little drop of water and it will go from fifty percent to just over fifty percent and we've met our burden of proof. That's an absolute and utter misrepresentation and manipulation of the burden of proof."

{¶ 30} Surely, the majority would not hold that the trial court abused its discretion by overruling these objections. Therefore, statements that Roetenberger did not object to are subject to plain-error review. "In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson* (1997), 79 Ohio St.3d 116, 679 N.E.2d 1099, syllabus.

{¶ 31} To support its determination that Dr. Saeed's counsel made unwarranted attacks on Roetenberger's counsel, the majority strings together a number of isolated statements. There is no dispute that closing argument is improper if counsel personally attacks opposing counsel. *Pesek v. Neurologists Assn., Inc.* (2000), 87 Ohio St.3d at 501, 721 N.E.2d 1011. Reversible error is founded on the principle that personal attacks that disparage opposing counsel are not based on the evidence and that even if there is no objection, the trial court has a duty to intervene and require counsel to proceed in an orderly, lawyerlike manner. See *Jones v. Macedonia–Northfield Banking Co.* (1937), 132 Ohio St. 341, 351, 8 O.O. 108, 7 N.E.2d 544; *Clark v. Doe* (1997), 119 Ohio App.3d, at 307, 695 N.E.2d 276. While some of the comments at issue may have been questionable, given the overall context in which they were made, I do not agree with the majority that the trial court had a duty to intervene. In my view, the majority has created a

per se rule of reversal based on counsel's use of taboo words and has overextended the holding in *Pesek*, supra.

{¶ 32} I also disagree with the majority's conclusion that counsel maligned Roetenberger's expert witnesses. In professional-negligence trials, expert testimony is almost always essential to prove negligence and causation. *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673. The ultimate question is, whose expert does the jury believe? Therefore, an expert's bias and pecuniary interest are appropriate subjects for cross-examination. *Calderon v. Sharkey* (1982), 70 Ohio St.2d 218, 24 O.O.3d 322, 436 N.E.2d 1008. Counsel should have leeway to challenge the quality of the expert evidence as long as counsel does not " 'create an atmosphere * * * surcharged with passion or prejudice and in which the fair and impartial administration of justice cannot be accomplished.' " *Pesek*, 87 Ohio St.3d at 501, 721 N.E.2d 1011, quoting *Jones v. Macedonia–Northfield Banking Co.* (1937), 132 Ohio St. 341, 351, 8 O.O. 108, 7 N.E.2d 544.

{¶ 33} The danger of examining remarks in isolation is amply illustrated here. For example, the majority exaggerates when it says that counsel called Roetenberger's expert, Dr. Mark Popil, an "idiot" and not credible because "he wore gym shoes and baggy pants." Counsel for Dr. Saeed did strenuously challenge Dr. Popil's qualifications to give an opinion about the use of Demerol and other drugs. Counsel did, perhaps intemperately, refer to Dr. Popil as an "idiot" and "incompetent," but not because of how the doctor was dressed. The transcript shows that this remark was simply a reference to an earlier observation that the jury saw Dr. Popil testify, as an emergency-room physician, dressed in emergency-room clothing.

{¶ 34} "Medical malpractice cases engender strong emotion, and there is nothing wrong with passionate argument." *Clark*, 119 Ohio App.3d at 307, 695 N.E.2d 276. The majority acknowledges that the trial court should accord great latitude to counsel in the presentation of closing argument to the jury. *Pang v. Minch* (1990), 53 Ohio St.3d 186, 559 N.E.2d 1313, paragraph two of the syllabus. The transcript indicates that the lawyers for the parties, as well as the court, were skilled and experienced in medical-malpractice trials. In my opinion, reversal on the basis of counsel's closing remarks reflects an expression of doubt by the majority as to whether jurors are capable of sifting through the complexities of the evidence and applying the law as they are instructed.

{¶ 35} From the record in this appeal, I have no doubt that the jury's verdict was rendered upon the evidence and was not improperly influenced by defense counsel's remarks in closing argument.

{¶ 36} Finally, I am convinced that the trial court's instruction on alternative methods was proper. This case is factually distinguishable from *Pesek*, supra, in

which it was undisputed that there was only one acceptable method of treatment. Dr. Saeed maintained that Karen Roetenberger's tragic death was caused by an air embolism, a complication of the ERCP surgery, but Roetenberger claimed that Dr. Saeed oversedated her. Based on the testimony of two experts, Roetenberger suggested that Dr. Saeed's use of the sedative Demerol, as opposed to a different sedative, during ERCP was below the standard of care. Therefore, in my view, the jury was presented with evidence that there was more than one acceptable way to treat, and it was instructed accordingly. If, indeed, this instruction was given in error, the jury was not misled and any error was harmless.

{¶ 37} I would affirm the judgment of the trial court.